## GENERAL ELECTRIC CO. v. LACO–PHILIPS CO.

(Circuit Court of Appeals, Second Circuit. June 7, 1916.)

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—INCANDESCENT LAMP.

The Just & Hanaman patent, No. 1,018,502, for incandescent bodies for electric lamps, consisting of a filament of substantially pure tungsten, was not anticipated and in view of the great superiority of the tungsten lamp over those of the prior art, which results from the use of tungsten, instead of carbon, as the filament material, must be accorded invention of a high order, and given a construction which will fully protect the invention; also *held* infringed.

2. PATENTS ☞21—ANTICIPATION.

In view of the fact that each chemical element differs in some of its properties from all others, a patent for the use of one as a material does not necessarily anticipate a later patent for the use of another for the same purpose, even though the two elements are classified in the same group.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 23; Dec. Dig. ☞21.]

3. PATENTS ☞176—VALIDITY AND INFRINGEMENT—NEW METHOD OF MANUFACTURING PRODUCT.

A patent for a new product of great utility, which also describes operative means for obtaining it, is not invalidated by the fact that later another and better way of manufacturing it is found, nor is infringement avoided by the use of the new way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 250⅔–252; Dec. Dig. ☞176.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the General Electric Company against the Laco-Philips Company for infringement of claims 1, 2, and 3 of letters patent No. 1,018,502, for incandescent bodies for electric lamps, granted February 27, 1912, to Just & Hanaman. Decree for complainant, and defendant appeals. Affirmed.

The following is the opinion of Mayer, District Judge, on final hearing in the District Court:

[1] The inventors state their object and their claims in language characterized by clearness and simplicity. They say:

"The present invention has for its object incandescing filaments for incandescent electric lights or lamps composed of substantially pure tungsten."

And they claim:

"1. A filament for incandescent lights consisting of tungsten in a coherent metallic state and homogeneous throughout.

"2. A filament for incandescent lights consisting throughout of substantially pure metallic tungsten of high fusing point and electrically conductive, the light emitting properties of the filament being due to the coherent, homogeneous metallic nature of the tungsten.

"3. A filament for electric incandescent lights comprising dense, coherent tungsten metal, having its fusing point approximately 3200° C, and capable of incandescent efficiency at the rate of less than 1 watt per candle power and substantially free from perceptible disintegration at that efficiency."

The result thus attained "may be manufactured" in accordance with either of two processes described in the specification, and either of which produces "substantially pure tungsten." One of these processes is known as the "squirting" or "sintering" process.

Defendant is an importer of lamps, and has sold two kinds, known in the case as "A" and "B" lamps. The filaments of lamps "A" were made by the "squirting" process, but since 1912 the importations and sales of lamps by defendant have been of those known as "B," which are provided with drawn-wire filaments. The filaments of "A" and "B" read unequivocally on the claims in controversy, and "A" is made according to the "squirting" process described in the patent in suit, but "B" is not so made. On the contrary, the "B" filament is produced pursuant to the process now in vogue and worked out by William D. Coolidge, one of plaintiff's staff of experts, and in respect of which the Patent Office has found invention, as evidenced by the issue of letters patent No. 1,082,933.

Defendant, commendably brushing aside immaterial contentions, presents in clean-cut and understandable fashion two defenses: First, that the patent in suit was anticipated by the prior patents of de Lodyguine and Welsbach; and, second, that it is not infringed by the drawn-wire filament exemplified in defendant's "B" lamp.

The effective date of invention is concededly November 4, 1904, and at the outset it becomes necessary to understand the state of the art as of that time. In October, 1892, the Circuit Court of Appeals for the Second Circuit rendered its decision in Edison Electric Supply Co. v. United States Electric Lighting Co., 52 Fed. 300, 3 C. C. A.

83.  At page 302 of 52 Fed., and page 85 of 3 C. C. A., Judge Lacombe said:

"In an incandescent lamp there is no break in the circuit, but there is introduced into it a piece of poorly conducting material, which is so arranged that its resistance to the passage of the current will develop heat sufficient to bring it to a state of incandescence.  The wires which conduct the current to the place where it is thus developed by resistance are so devised as to present but small resistance to its passage.  The effective resistance begins where the piece of poorly conducting material (the burner or illuminant) is placed, and the lamp expires when the burner is consumed, breaks or wears away. The longer the life of the burner the longer the life of the lamp, and the more available it becomes for practical electric lighting.  The selection of materials for the various parts of the circuit thus formed, their manipulation, arrangement, and operation, have for many years occupied the attention of experimenters, and the results of their labors, made public from time to time, constitute the state of the art of incandescent electric lighting."

So far as this art is concerned, the decision supra settled the proposition that the material of which the filament is composed may be the subject of invention.  This decision was, of course, of great commercial advantage to the successful party, and justly gave control to the owners of an invention of great merit and world-wide usefulness. There were thus two motives which actuated scientific men and their financial backers in endeavoring to find an effective departure from the carbon filament: (1) The natural and important desire to discover some material, new for this purpose, which would open up fresh fields of commercial success; and (2) the hope of avoiding the Edison patent, with its resultant requirement of tribute.

The dominance of the carbon filament lamp can best be illustrated by the fact that over 99 per cent. of the incandescent electric light lamps sold in the United States as late as 1907 were of that type.  In 1901, John W. Howell, a distinguished lamp engineer, read a paper at a meeting of the Association of Edison Illuminating Companies. He began:

"This is the twentieth year of the commercial use of incandescent lamps, and it is also the twentieth year of my connection with the Edison Lamp Works. The object of this paper is to review the development of the lamp during this time, to note its present condition, and to indulge in some theoretical considerations of its possible future.  *  *  *  You will observe that each and every lamp in this case contains all these essential parts, and that no lamp in the case contains any part in addition to these.  The lamp of 20 years ago was essentially the same as the lamp of to-day.  Mr. Edison's invention was a complete one, and all the work which has been done on the lamp since has made no radical change in Mr. Edison's lamp.  Even Mr. Edison himself has not been able to add an element to his lamp of 20 years ago, nor has he been able to omit one of the original elements."

He pointed out that the incandescent lamp offered "a very attractive field of work for the inventor," and that the General Electric Company wanted every good invention in this line, and was ready to investigate anything and encourage inventors to complete their efforts. He stated that:

"Improvements so far made have been of one of the two classes mentioned—either the filament has been made capable of remaining stable at a higher temperature, or it has been made capable of maintaining a given temperature

with a less supply of energy. * * * Any radical or considerable improvement will, I believe, be made by a change of the first class."

And, then, not in the language of watts and filaments, but in terms of simple lay expression, he concluded with an observation which may well be a signpost on the judicial pathway:

"When such an improvement is made it will be an invention or discovery, and no one can predict what its nature or amount will be, any more than we can predict the thing itself. *To predict it would be to make the invention or discovery, and most inventions are the result of work, and not of prediction.*"

The same thought had been expressed, in substance, in an article by Dr. L. K. Bohm, in the Electrical World of January 13, 1894, where the author, inter alia, observed:

"Notwithstanding the fact that numerous improvements in incandescent lighting have been patented since the invention of the commercial lamp in 1879, yet there is a vast field for inventors in this line. Quite recently experimenters have taken up the subject again with renewed vigor, since Edison's fundamental patent of January 27, 1880, was sustained by the Circuit Court of Appeals on October 4, 1892. As a consequence of this decision, a number of lamp-manufacturing companies closed their factories by order of the court, and as they possessed the facilities for the manufacture of lamps they were certainly very anxious to adopt new lamps which would at least stand a fair fighting chance in the courts, if they were not entirely independent. * * * The greatest chance for improvement is and will be in the future in the filaments. Inventions in this line will be of great value, even after the Edison patent has expired. * * * However, for one reason or another, these lamps have never replaced the carbon filament lamp. There is still in this direction a great field for inventors. Some experimenter may discover a composition which is a sufficient conductor of electricity and allows the manufacture of high-resistance filaments for incandescent lamps, which do not volatilize so much as carbon and maintain their candle power for a longer time than the present lamps, even when burned at a higher economy. If such compositions for filaments are discovered, which will give incandescents of greater durability, then they certainly can be made of higher efficiency, say of at least 2½ watts per candle.'

Plaintiff's Exhibit Book is full of issued letters patent, notable only for their record as failures, and in that list of patentees are men of great distinction in an art, which by its very nature calls for men of marked equipment. Powerful business organizations, such as the Westinghouse Company here and Siemens & Halske in Germany, were leaving no stone unturned and sparing no expense to solve the problem.

In 1902 Just and Hanaman were assistants to Professor Vortmann of the Technical "Hochschule" in Vienna, and in August of that year Just, who was spending his spare time attempting to develop a boron incandescent lamp, engaged Hanaman as a chemist for that work. The work continued until the latter part of 1904, when the laboratory in which they were working was closed and the experimenting ended in failure. Meantime, however, these men conceived the idea of making an incandescent electric lamp with a filament of tungsten. Their means were limited, the income of one being a trifle under and of the other a trifle over the equivalent of $50 per month. But they persevered, and, although one of their early attempts failed (German Patent of 1903, No. 154,262), they finally succeeded in producing pure tung-

sten filaments, and filed their application for a British patent, No. 23,-899, on November 4, 1904, and on the same day their application for a French patent, No. 347,661.

In this country, the application which resulted in the patent in suit was filed July 6, 1905. The revolution in the art has been striking. The carbon filament has almost disappeared. The Osmium, Nernst, and Tantalum lamps made no impression on the art. The Gem, which gave promise of a brilliant future, is on the retrograde. The tungsten lamp represents a commercial use expressed in figures which are dazzling, even in this day, when we are no longer astounded by mention of millions of men or money.

From practically zero per cent. of sales in 1907 in the American market the per cent. in 1914 by consistent upward movement was 71. Carbon, over 93 per cent. in 1907, had been reduced in 1914 to less than 10 per cent. Tantalum, about 10 per cent. in 1907, was reduced in 1914 to zero. The Gem, rising from about 6 per cent. in 1907 to over 33 per cent. in 1912, was down to 22 per cent. in 1914, and the claim is made that the difference in cost of incandescent lighting between the use of the tungsten lamp and that of the Gem would represent a saving to the American public of over $203,000,000 annually.

Prior to the introduction of the tungsten lamp here, Just & Hanaman in 1905 succeeded in having their invention taken up by a Hungarian factory, and in the spring of 1906 the German rights were sold to a German corporation, and later the rights in the United States were sold to the plaintiff for $400,000, of which half was paid to Just & Hanaman and half to a rival inventor, Kuzel, by virtue of a pooling arrangement between the parties. The issue of the patent in the United States was delayed, however, by an unusual situation. There was a Patent Office interference between four different parties, one of whom was a man named Heany, and it was charged that Heany or his attorney, with the connivance of one of the Patent Office examiners, had fraudulently introduced into the specification of one of his applications subject-matter derived from the Just & Hanaman application.

An extended investigation was made by the Patent Office and Deputy Commissioner Billings handed down, on July 7, 1911, a thorough and comprehensive decision holding that the frauds charged were proved. 171 O. G. 983. Heany's application was stricken from the files of the Patent Office, and his attorney and the examiner were convicted of crime; the interference being suspended pending the determination of the criminal proceeding. The plaintiff owned the remaining three applications which were involved in the interference in the Patent Office, namely, those of von Bolton, Kuzel, and Just & Hanaman, but offered evidence on behalf of Just & Hanaman only.

The situation was that the plaintiff had paid large sums of money for these applications and naturally was interested in securing a valid patent. It was, of course, a matter of indifference to plaintiff which application was successful, provided that the patent was rightly issued to the first and real inventor. Thus a heavy responsibility was laid

upon the attorneys for plaintiff, and, as a result, a thorough investigation was made by them, and, after cautious and thoughtful consideration, plaintiff was advised that the patent should issue in favor of the Just & Hanaman application. The fact that the plaintiff, under the advice of careful and experienced counsel, thus decided for itself upon which patent to stand, is evidence of an open and frank manner of dealing with a difficult problem, and ipso facto relieved the proceeding of any suggestion of collusion, which might have followed had different counsel been engaged by plaintiff to urge the merits of the respective applications then pending.

The Kuzel application may be dismissed from consideration without further comment, because it is neither pleaded nor relied upon, nor has it the slightest merit. The von Bolton application (serial No. 232,262, dated November 10, 1904—see also Siemens & Halske patents in Great Britain, No. 20,277, dated September 20 ,1904; in Belgium, No. 179,-628, dated September 22, 1904; and in Germany, No. 169,928, dated July 30, 1904) was insufficient in disclosure and inoperative, and, in addition to what the experts say, the course of Siemens & Halske in relation to the von Bolton patent is the best proof of its lack of utility. Siemens & Halske were never able to use the von Bolton process, and in 1908 announced the view that tungsten was not ductile (British patent, No. 5,387, of 1908), although von Bolton thought it was. Siemens & Halske were, of course, anxious that they should own and control a lamp which would take the place of the carbon filament lamp, and they developed a nickel binder process—important here only as showing lack of faith in von Bolton's efforts—and as late as 1913 Alexander Siemens, their London representative, read a paper in which he briefly reviewed the art, and told of the work of Siemens & Halske, and in this article there is not a suggestion that von Bolton was an inventor of the tungsten lamp.

Space will not permit a more extended discussion of von Bolton's alleged invention, and those interested will find that subject clearly discussed in the briefs submitted on behalf of the parties to this litigation. It was, of course, fortunate that an invention of such real service to the world, came into the hands of a business institution, possessed of abundant capital to contest to a finish, rights which men of slim means, for lack of capital, might have been unable to push to security. Thus it was that an invention made in 1904 was finally officially recognized in the United States by the issuance of a patent in 1912.

Tungsten is an elementary metal known long before the Edison invention. The problem with which the inventors were grappling was to discover a metal capable of practical use from the scientific and commercial standpoint which would have the attributes necessary for the filament of an incandescent electric lamp. Scientists had experimented with many methods and materials, and although tungsten was thus well known, its properties had not been fully discovered and understood until Just & Hanaman. These properties are concisely summarized in plaintiff's brief as follows:

"1. Its melting point is very high, substantially 3200° C.

"2. It has a low vapor tension, so that it does not disintegrate—i. e., evaporate rapidly—even at the exceedingly high temperatures corresponding to a lamp's efficiency of one watt per candle.

"3. It has the extraordinary property that its electrical resistance at running temperature is substantially 13 times its electrical resistance at room temperature.

"4. And of course, most important of all, it is, as the patentees put it, 'capable of incandescent efficiency at the rate of less than one watt per candle power,' and 'substantially free from perceptible disintegration at that efficiency.'"

Dr. Irving Langmuir, a graduate of Columbia University, a postgraduate student at Goettingen, afterwards an instructor at Stevens Institute, and then a research chemist with plaintiff, thus describes the characteristics of tungsten:

"In general, when a substance is placed in a vacuum, it tends to give off vapor; some substances much more than others. For example, water gives off vapor so readily in a vacuum that even at room temperature water will boil if placed in a vacuum. Most metals, however, have very little tendency at room temperature to give off vapors. Mercury, however, gives off very perceptible quantities of vapor, so much; so, in fact, that even in the air the vapors from large quantities of mercury are apt to have poisonous effects on those who breathe such air. Zinc begins to give off such vapors at a temperature of 200° or 300° C., and at a temperature of approximately 900° C. it will boil, even at atmospheric pressure. At higher temperatures, all metals give off vapors, when heated in a vacuum, and distill from the surface of the hot metal to any cooler surfaces on which they become condensed. Tungsten is very remarkable, in that it has an extremely small tendency to give off vapors, so that it can be heated to over 3000° C. before it begins to lose weight very rapidly when heated in a vacuum. It is largely due to this property of tungsten that it is possible to run tungsten filaments at the extremely high temperature at which they are run in practice (in the neighborhood of one watt per candlepower), without having such a large quantity of metal distilled from the filament to the bulb as to reduce the strength of the filament and to cause a deposit on the bulb, which would absorb a seriously large proportion of the light."

Having in mind these characteristics of tungsten now understood by scientists, and the persistent search for a substitute for the carbon filament, let us see how von Welsbach and de Lodyguine approached the problem. The attempt of von Welsbach can be simply and briefly stated. That distinguished man thought that osmium was the desired metal, and described the osmium incandescent lamp in a series of American and foreign patents. The price of osmium metal is at the rate of $500 per pound, and it is one of the rarest metals in the world. The price of tungsten is $1.25 per pound.

[2] If it be assumed that the Welsbach process or processes, if applied to tungsten, would produce the Just & Hanaman pure tungsten filament, the argument leads us nowhere. As Dr. Liebmann points out:

"Osmium belongs to the platinum group. The grouping of the elements primarily does not indicate that even the members belonging to one group have all the same properties and answer to the same reactions. If that were so, chemical science would be at an end. * * * According to the periodic system, which is the theory of classification dominant to-day, tungsten forms one of four metals, chromium, molybdenum, tungsten, and uranium.

Osmium is still a member of the platinum group, viz., platinum, iridium, osmium, palladium, rhodium, and ruthenium. The grouping of the elements in these classes does not involve the sameness of properties or of susceptibility to reactions. The grouping is effected on certain principles and certain facts which are known. If all members of one group had the same properties, there would be only one member possible. Conclusions as to new and unknown reactions cannot be drawn, even if two elements belong to the same group."

And as the same expert truly says:

"Chemistry is essentially an experimental science, and chemical prevision is as impossible to-day, in spite of the accumulation of the great knowledge, as it was in former times. What I said about members belonging to one group I say more emphatically of members belonging to different groups. No conclusions can be drawn from the behavior of an element belonging to one group as to the behavior of an element belonging to another group."

See Naylor v. Alsop Process Co., 168 Fed. 911, 919, 94 C. C. A. 315; Badische v. Levenstein, 12 App. Cas. 710; Celluloid Mfg. Co. v. American Zylonite Co. (C. C.) 35 Fed. 301.

In other words, von Welsbach, who had made valuable contributions to the lighting art, both practically and theoretically, did not see tungsten, a cheap metal right at his door, as it were, but departed into distant chemical lands on a vain journey of exploration, at the end of which the osmium lamp was a wreck abandoned to its fate.

The two de Lodyguine patents become important because of the elaborate experiments calculated to prove as matter of fact that, pursuant to their teachings, a pure tungsten filament can be produced. The first patent, No. 575,002, was issued January 12, 1897, on application filed January 4, 1893.

"I have discovered," said de Lodyguine, "that the following metals possess all the essential qualities for forming a practical, commercially efficient metallic illuminant for incandescent electric lamps, namely, molybdenum and tungsten, rhodium, ruthenium and iridium, ruthenium and osmium, and chromium, and I have also discovered means whereby they may be formed into an attenuated threadlike wire in an economical and successful manner All these metals are infusible at such temperatures as are necessary to render them brilliantly incandescent, and are very efficient as light-producing mediums. They are, however, almost absolutely nonductible, and are extremely hard and brittle. They therefore cannot be drawn out into wires in the manner employed in operating upon ductile metals. While there are other metals known to science having fusing points sufficiently high for use in this art, and processes are known whereby they may be separated from their compounds, yet those above enumerated are found particularly desirable for the purposes of my invention, although such other metals, when prepared in the manner herein described by me, will fall within the scope of this patent."

He concluded his specification:

"I fully appreciate the fact that other processes than those above mentioned and detailed may be employed in carrying out my method of making metallic illuminants, and I do not limit myself to any one or all of those enumerated herein. I look upon it as a novel method of making metallic illuminants to build them up around a fillet having no permanent function, but merely serving as a support during manufacture, much as a mold supports a casting."

He made 12 claims. It is enough to quote claim 1:

"1. An incandescing illuminant for electric lamps composed of an incandescing metallic body and containing a conducting fillet of different material, substantially as described."

De Lodyguine did not describe any particular method of subsequent removal of the fillet. De Lodyguine says. that his coating is formed either by electrochemically depositing the metal on the fillet in an electroplating bath or by hanging the fillet in a proper atmosphere and chemically depositing the coating upon it while it is heated by electric current or otherwise. If the coating is to be of molybdenum or tungsten, the atmosphere is "chloride or chlorate," or the fillet is, alternatively, electroplated in a bath of the fused chloride.

This is the whole disclosure, as far as it relates to tungsten, and the result, if there is any result, is a composite filament which has never gone into use. The rest of the patent deals with the alleged methods of depositing rhodium, iridium, ruthenium, osmium, and chromium.

The second patent, No. 575,668, was issued January 19, 1897, on an application filed April 10, 1894. Here, after referring to his first patent, de Lodyguine said:

"My present invention also includes the illuminant for incandescent lamps composed of such a metal, and the metals which I have hitherto found best adapted for use in this process in the manufacture of this product are molybdenum and tungsten."

Wherever, in his claims, a particular metal is named, that metal is molybdenum, and not tungsten. Claims Nos. 1 to 5, inclusive, are method claims. The product claims are Nos. 6 and 7, as follows:

"6. An illuminant for electric lamps composed exclusively of an incandescent body of molybdenum, substantially as described.

"7. An illuminant for electric lamps composed of an incandescent body of molybdenum, and containing a platinum fillet, substantially as described."

What de Lodyguine disclosed was a high-resistance metal coating on a carbon or platinum base, not a pure tungsten filament. In thus stating my conclusion, I may add that it is useless to attempt a description or analysis of the experiments made in Holland by defendant or the further tests made by J. A. Orange, a chemist attached to the research laboratory of plaintiff. It is equally useless to try to summarize the testimony and arguments of experts of such attainments and high repute as Professors Thomson and Main, because there are so many points to be considered that the only satisfactory way for any one interested is to read the briefs as fortified by the record, and less than that will not do justice to the respective contentions. But there are some entirely human, and as I think safe, guides for a lay court to follow in presuming to decide difficult questions of chemistry in respect of which skilled men of real and deserved repute so sharply differ.

The men who conducted the Holland experiments were of the remarkable younger type produced by the thorough technical schools and universities of continental Europe. How much of the modern art did they import into their demonstrations, let us say, subconsciously? How

can a court in this very practical age be convinced of the absolute accuracy of experiments post, when the alleged anticipation ante died in its infancy, and the present invention captured the commercial art almost instantaneously? But more than that. The Westinghouse Company was vitally interested in getting away from the Edison patent. Its resources were placed at de Lodyguine's disposal. He had carte blanche in every sense. No one would have been quicker to see and know whether he had succeeded than his employers.

What they wanted was a lamp which would compete with, if not displace, the Edison. They were not concerned with learned theses nor pleasing laboratory exhibitions. De Lodyguine produced nothing. What he did was futile, and he will be remembered on this subject only because his name is in this record. Experiments made, some 20 years later, strike the stone wall of practical history and there lie demolished; and by the same token the prior art fails to negative invention by Just & Hanaman.

[3] There is, however, a question of first magnitude relating to the alleged infringement of lamps B. These are made by substantially the Coolidge drawn-wire, and not by the Just & Hanaman "squirting," process. The former is the process of the modern art, because the lamps are stronger, and are made more cheaply and with greater uniformity. On this branch, defendant has two main contentions: (1) That the file wrapper history discloses that Just & Hanaman renounced the drawn-wire process; and (2) that, in view of the prior art, the patent in controversy must be limited to a product produced by the processes therein described. In a sense these contentions come down to one inquiry, and that is: What is the law of the case as applied to this product patent?

It is, I think, well recognized that there are two schools of thought in relation to this subject. Some hold the view that, if the product is novel, subsequent new processes must be tributary. Others believe that such a doctrine tends to arrest invention, and more especially where the process, as in the case at bar, practically revolutionizes the commercial manufacturing art. There is much to be said for each view, but courts must follow the law as it is.

I think the invention here in suit is of great merit, entitled to firm support, and second only to Edison's. Edison found a dim pathway and transformed it into an illuminated road. Just & Hanaman have broadened that road into a boulevard, alive with blazing lights. It is not hyperbole to say that the tungsten lamp has made millions happier for its greater comfort and its better cheer. We accept so readily as old what was new yesterday that our senses sometimes become dull to the real accomplishments of our own time. We have almost forgotten the Edison lamp, and as we read or ride, watch the play, or sit patiently while men of the hour in public places speak in happy or ponderous phrases, as we travel by land or water, as we labor on an overcast day in the courtroom, the schoolhouse, at the counter, or in the heights edging on the modern canyons of a metropolis, we find we have a better attitude and a more hopeful temperament because literally the tungsten lamp has made our physical surroundings brighter and more

inspiring. To such an accomplishment that tribute should be paid which our laws contemplate.

The views expressed in Electric Smelting & Aluminum Co. v. Pittsburgh Reduction Co., 125 Fed. 926, 933, 60 C. C. A. 636, 643, seem peculiarly applicable to the case at bar:

"Hall's achievement should be considered in the light of an improvement upon Bradley's fundamental discovery. There can be little doubt that the defendant's process is a valuable one and that to it is largely due the cheap aluminum of the present day. There is not the least disposition to detract from the merits of Hall or minimize his contribution to the art. Indeed, it may be conceded that, if the novel features so introduced be secured by a valid patent, he can hold the monopoly against all, Bradley included. This concession does not permit him, however, to appropriate the broad invention. He does not acquire the right to use the Bradley process simply because he has improved that process. He is entitled to enjoy what is his, but in so doing he cannot appropriate the property of another. The record discloses nothing unusual in this regard. It is rarely that an invention develops ultimate perfection in the hands of the inventor. The test of actual use discovers defects to be remedied and suggests improvements to be made. If the inventor produces a new and useful result, he does not lose his reward because he, or some one else, subsequently renders it more useful." Rubber Co. v. Goodyear, 9 Wall. 788, 796, 19 L. Ed. 566; Maurer v. Dickerson, 115 Fed. 870, 874, 51 C. C. A. 494

The file wrapper might seriously embarrass plaintiff, if the invention were for a process; but it was for a product. This is one of those cases where, by very virtue of the fact that the result was new and meritorious, not too much emphasis is to be placed on the fencing with the Patent Office. Westinghouse Electric & Mfg. Co. v. Condit Electrical Mfg. Co., 194 Fed. 427, 430, 114 C. C. A. 389. Here Just & Hanaman's attorney at one period had claims for a sintered tungsten filament only, and presented arguments discriminating the von Bolton British patent or other references upon the ground that they assumed without warrant a drawn filament and that pure tungsten could not be drawn. After Just & Hanaman's proposed product claim had been limited, the Patent Office put Just & Hanaman into interference with von Bolton, Kuzel, and Heany—the processes being: (1) Just & Hanaman, carbon-binder squirting and sintering process; (2) Kuzel, colloidal squirting and sintering process; (3) Heany, squirting process; and (4) von Bolton, a wire-drawing process. Kinnan, the Patent Office examiner, in a careful review, pointed out that:

"The object sought to be attained by each party is a pure tungsten filament. Each alleges under oath that such a filament is produced by his process."

Finally, after all the arguments and difficulties, the patent was issued with the present product claims, having been preceded by a final amendment dated January 26, 1912, and received January 27, 1912, offered by the attorneys for Just & Hanaman, in which they set forth under the head of "Remarks":

"Claim 1, canceled by this amendment, has been objected to on the ground that it attempts to describe an article of manufacture by the process of making. As claims 5, 6, and 7, now recopied as 1, 2, and 3, forming the subject of the interference with Kuzel and von Bolton, decided in our favor, describe the applicants' invention without reference to the process of manufacture, the invention is sufficiently protected, and claim 1 is therefore can-

celed in view of the formal objection thus raised." Reed Mfg. Co. v. Smith & Winchester Co., 123 Fed. 878, 881, 59 C. C. A. 366.

The most, therefore, that the file wrapper shows adversely against the plaintiff is that the inventors, who pointed out the desired product and showed two ways in which to produce it, failed to appreciate that there was still another way in which the same result might be attained. The fact that later some one found another and better way to manufacture the product does not, in this case, affect the validity of the patent, which originally disclosed the product and at the same time described operative means for obtaining it.

The patent is valid, all claims are infringed by lamps A and B, and a decree, with costs, may pass accordingly. Settle decree on five days' notice.

Thomas B. Kerr, A. Parker Smith, and John C. Kerr, all of New York City, for appellant.

Frederick P. Fish, of Boston, Mass., Hubert Howson, of New York City, W. K. Richardson, of Boston, Mass., and Albert G. Davis and Alexander D. Lunt, both of Schenectady, N. Y., for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

PER CURIAM.    Decree affirmed, on the opinion of Judge Mayer.