GENERAL ELECTRIC CO. v. NITRO–TUNGSTEN LAMP CO.

(District Court, S. D. New York. October 27, 1919.)

PATENTS ☞328—FOR INCANDESCENT LAMP VALID AND INFRINGED.

The Langmuir patent, No. 1,180,159, claims 4, 5, 12, and 13, for an incandescent lamp, with a nitrogen-filled bulb and tungsten filament, *held* not anticipated and to disclose invention of highly meritorious character; also *held* infringed.

In Equity. Suit by the General Electric Company against the Nitro-Tungsten Lamp Company for infringement of all 13 claims of letters patent No. 1,180,159, issued April 18, 1916, to plaintiff, on application filed on April 19, 1913, by Irving Langmuir. Decree for complainant.

Frederick P. Fish, of Boston, Mass., Hubert Howson, of New York City, and Albert G. Davis and Alexander D. Lunt, both of Schenectady, N. Y., for plaintiff.

Williams & Holland, of New York City (William B. Greeley and Charles J. Holland, both of New York City, of counsel), for defendant.

MAYER, District Judge.   Invention is the substantial question involved, for, if established, infringement of certain claims is unquestioned.   The search for improvement in lighting means began at least as far back as about 1840, but the real art in incandescent lamps started with Edison in 1879, when he created the commercial incandescent lamp by producing the one-piece bulb, the carbon filament and the vacuum.

To those skilled in the art the details of Edison's contribution need not be recited.   It so happens that much of the outline of the progress of this art is to be found in reports of court opinions beginning with the so-called Edison Lamp Case.   Edison Electric Light Co. v. U. S. Electric Lighting Co., 52 Fed. 300, 3 C. C. A. 83.   After Edison's pioneer step, the thought of inventors was mainly directed to improvements in the filament, and the story of the achievement of Just and Hanaman, whose work culminated in the tungsten filament, is told in the so-called Tungsten Lamp Case.   General Elec. Co. v. Laco-Phillips, 233 Fed. 96, 147 C. C. A. 166.   The tungsten filament of Just and Hanaman, however, was fragile, and this difficulty led to further endeavor, eventuating with the ductile drawn tungsten filament of Dr. Coolidge.   The tungsten lamp with the Coolidge filament marked the furthest and last advance in the art until the Langmuir invention.

The Langmuir lamp has proved extraordinarily successful.   In street and display illumination it dominates the commercial field, and from the standpoint of aggregate product for use in many ways, and return in dollars and cents, the record demonstrates unquestioned commercial utility.   With this indisputable success, the question is whether Langmuir has merely taken advantage of well-known facts and data to an extent within the knowledge of only a man having the qualifications of one skilled in this art, or whether the accomplishment was so advanced as to rise to invention.

Langmuir is a scientist of extensive education and extraordinary ability, possessed of persistency and patience, and gifted with the kind of imagination which is valuable, when curbed by analysis.   With this equipment he undertook the task which resulted in his "present invention," which "relates to improvements in incandescent electric lamps whereby it is possible to produce a lamp capable of operating at extraordinarily high efficiency and giving a light of marked increase in intrinsic brightness and whiteness."   Claims 1 and 12 are illustrative of the invention claimed.

"1. In an incandescent lamp, the combination of the closed lamp bulb, a gaseous filling therein of substantial pressure at the operating temperature of the lamp, and of substantially poorer heat conductivity than hydrogen, and a filament of such high melting point and low vapor pressure that it may be operated during a long, useful life at a temperature higher than that of a tungsten filament operating in a vacuum at an efficiency of one watt per candle."

"12. In an incandescent lamp, the combination of the lamp bulb, a tungsten filament therein, and a gaseous filling; the effective diameter of the filament being sufficiently large, and the heat conductivity of the filling being sufficiently poor, to permit the lamp to be operated with a filament temperature in excess of that of a vacuum tungsten lamp operating at an efficiency of one watt per candle and with a length of life not less than that of such a lamp."

Defendant states its defense frankly and clearly as follows:

"There is not found in the prior art any instance of an incandescent electric lamp having a filament of tungsten, whether drawn or squirted, in an atmosphere of nitrogen, and anticipation, therefore, is not alleged. It is contended, however, on behalf of the defendant, that, the characteristics and usefulness of the tungsten filament, drawn and squirted, straight and coiled, as a filament for an incandescent lamp, having been well understood in the art before Langmuir's application for the patent in suit, and the characteristics and effect of nitrogen as a filling for incandescent lamps with filaments metallic and otherwise, also having been well understood in the art before Langmuir's application, Dr. Langmuir, in putting the tungsten filament into an atmosphere of nitrogen, in which neither element had any new function by reason of the combination, exercised only the skill of one familiar with the art, and made no patentable invention."

It will conduce to simplicity to describe in near-lay language, what Langmuir's invention is. This is admirably done at page 849 of the "Handbook for Electrical Engineers," New York, 1914, edited by Dr. Harold Pender, defendant's expert, as follows:

"*Nitrogen-Filled Lamps.*—This type of lamp has a closely coiled helical filament of drawn tungsten wire mounted in a glass chamber filled with nitrogen or other inert gas. The pressure of the gas retards the decay of the filament, so that it may be operated with a satisfactory life at a higher temperature than is practicable in a vacuum. The gain in radiant efficiency so obtained is offset in part by the convection of heat from the filament by the gas. When the diameter of the filament is minute, there is little or no net gain in efficiency. When the filament is relatively heavy, the net efficiency may be doubled. The helical coiling of the filament increases its effective diameter as a radiant, and simplifies the problem of its support, for the filament is distinctly soft when incandescent. The gas-filled lamp has an elongated bulb, the upper portion of which serves as a cooling chamber. The walls of this chamber receive the black deposit from the filament, but are so placed that they absorb but little of the useful light. The gas-filled lamp is designed for operation in a pendent position. Such lamps are much more brilliant than vacuum lamps, and should be fully shaded. The light of the gas-filled lamp is decidedly whiter than that of the vacuum tungsten lamp."

The invention described supra, according to plaintiff, is a co-ordination, a new relation of parts, a new combination. It was arrived at after a long and tedious effort, described with great particularity by Dr. Langmuir, whose recital is accepted by the court as by him set forth. It was undertaken, or in course of progress, when men like Edison and Wickenden saw no hope in the nitrogen or other gas filled lamp, and authorities like Von Siemens and Monasch doubted whether it would be possible "to construct a much more economical glow lamp"; yet, while vacuum lamps for 110–115 volt circuits are not now made in sizes above 100 watts, the Langmuir lamps range from 50 watts to 1,000 watts or over.

The heat delivered to the filament of an incandescent lamp and dissipated therefrom is carried off in various ways: (1) By useful radiation, i. e., in the form known as light; (2) by dark heat radiation, not perceived as light; and (3) by convection.

In a vacuum lamp, the only loss of importance is (2) supra and, of course, the aim is to lessen this loss. It is now elementary that, the hotter the filament, the higher the efficiency of the lamp; but, as the temperature is increased, the life of the lamp is shortened, because of

the ultimate destruction of the filament, preceded by a process of what might be called disintegration, resulting in a blackening of the bulb. Just when these results occur depends upon the filament and the temperature. It was common knowledge that a tungsten lamp could be operated at three-fourths of a watt per candle, or, perhaps, even one-half a watt, but that, at such efficiency, the lamp would be readily destroyed, and hence of no practical value.

This relation of high temperature with lessened life of filament had to be reckoned with. So, also, with (3), the loss by convection currents, which, according to Howell's testimony of Edison's experiment, is claimed by plaintiff to be the reason for Edison's failure in respect of the carbon nitrogen lamp.

Langmuir, however, introduced nitrogen or other gases into his lamp at considerable pressure, and thus deliberately accepted an obstacle which his theory of co-ordination and corelation was to overcome. It is because the scientist might have been expected to pursue other directions that the invention in controversy is claimed to reside in—

"so co-ordinating the pressure and character of the gas with the nature and size of the filament, and with the temperature at which the filament is run, as to create, notwithstanding this additional loss, a lamp which at a given average useful life produces more light or better light for the same amount of electric energy than is produced by the corresponding vacuum lamp."

With this contribution of a concededly new result, highly successful from an operative and commercial standpoint, we turn to the prior art to ascertain its teachings. Much of this prior art was before the Patent Office, and but four references are new in this suit —Waring, Fox, Thomson, and Abel. Much of the prior art consists of isolated statements of now accepted principles or of fruitless endeavors to produce a practical result. It is very much the same kind of situation as is presented when some or all of the separate elements of a puzzle are laid before one, and the problem is to put the elements together, so as to build the toy house, or railroad, or what not, which constitutes the achievement of the puzzle.

The Grove publication of 1845, the Fox British patent, No. 3,988 of 1878, the Gordon British patent, No. 218 of 1881, all preceding Edison's patent of 1883, taught nothing. Edison, in his patent No. 274,-295 of March 20, 1883, made a serious attempt to produce a gas-filled nitrogen, inter alia, lamp. He failed, and Howell graphically describes how completely he failed. He supposed he should reduce the size of the filament, in order to reduce the cooling effect of nitrogen; and the fact that the thought of the workers in the art was thereafter largely directed to finding the right material for the filament is some indication, at least, that Langmuir's conception was bold in returning to gases.

At this point it is desirable to refer to the "getter," which is clearly described in the following extract from Howell's testimony:

"In all these lamps, from the Edison lamp of from 5 to 6 watts per candle to the tungsten lamp of 1.0 watt per candle, no addition or subtraction was made to or from Mr. Edison's original lamp, or any of the elements of it. The original lamp had three elements. They were a filament, a vacuum, and an all-glass globe, and every lamp made from that time on until Dr. Langmuir's

invention had those three elements, and no more—every one of them. Every commercially successful lamp had the same three elements that Mr. Edison's lamp had—a filament, a vacuum, and a glass inclosing globe.

"During the time that these filament improvements were carried on, great advances were made in the preparation of the vacuum. In 1881, when I went to work in the lamp works, it took five hours to exhaust a lamp, and only one lamp was put on one pump. I have records now showing the time that it took to exhaust one lamp. That showed the time it took to exhaust the lamp on a mercury Sprengel pump; a very good vacuum being produced thereby— very good, indeed; just as good as we get to-day. By improving that pump we reduced that time gradually to half an hour—from five hours to one-half hour.

"In 1895 the Malignani method of exhaustion was invented. A mercury pump will take out the air and other gases quickly, but the great trouble is that it will not take out the water vapor. A mercury pump will not take out water vapor sufficiently, because the vapor pressure of water is probably less than the vapor pressure of mercury, so that on those mercury pumps we had to have, and to-day have, chemical means of removing water vapor. That was done by placing a connection with the pump, and as close to the lamp as possible, a small vessel containing phosphoric anhydride, which absorbs the water vapor very greedily.

"Malignani's invention consisted in placing in the small tube in which the exhaustion is produced, as in that lamp, a little piece of red phosphorus—I think there is some in that tube now, a little reddish color—and when the lamp was on the pump, and all the air had been taken out, they heated that phosphorus until it vaporized, and that sent into the lamp a little cloud of phosphorus vapor, which produced a chemical reaction, which made a perfect vacuum.

"By that invention we could exhaust a lamp in less than one minute. It reduced the time from 30 minutes to one minute. In that way we could produce a more uniform exhaustion than was ever produced before.

"Phosphorus or other substances, used in a lamp in that way, used by introducing them into the vacuum after the air had all been taken out, are called vacuum 'getters.' They 'get' the vacuum. It is a homely term, but it is well established in the industry.

"That carries the lamp up to 1913, when Dr. Langmuir's announcement of the nitrogen-tungsten lamp was made. Before this every lamp contained as good and as high a vacuum as possible, and every one realized that a vacuum of the highest type was a necessary part of every incandescent lamp, and it was; every incandescent lamp ever sold commercially, or ever used, had a high vacuum in it."

The United States patent to Waring, No. 297,038, is referred to for its acknowledgment of the effect of an atmosphere of hydrogen or nitrogen in reducing the heat of the filament, and for the paper read in reference thereto by Prof. Anthony in 1894. This Waring lamp is dealt with by Judge Shipman in Edison Electric Light Co. v. Waring Electric Co. (C. C.) 59 Fed. 358, 363. Its pertinency, according to defendant, lies in the fact that in 1894 lamp manufacturers and engineers were discussing the effect of pressure, and were discussing and understood the effect of an inert gas under pressure in the bulb of an incandescent electric lamp. While the lamp burned out quickly, it apparently remained relatively clean up to the point at which it burned out, and Prof. Anthony held the opinion that it was shown that evaporation was prevented by bromine gas. The evidence is satisfying that this result was due to a "getter" action, whereby the evaporated carbon combined with the bromine, forming a light-colored compound less harmful on the globe than the uncombined carbon would have been.

But Langmuir's invention is not a "getter" invention, although it

is conceded that there is a helpful "getter" action when nitrogen is used, but such "getter" action in the Langmuir lamp is incidental to the real invention. This question of "getters" is aptly summarized in the brief of plaintiff thus:

" 'Getters' have been used with vacuum lamps with good results. It was the chemical 'getter' action which helped to reduce the consumption of the vacuum tungsten lamp from 1.25 to 1.1 watts per candle when the long life of 1,000 hours was standardized. It was the Langmuir invention (involving a physical rather than a chemical action) which reduced the consumption from 1.1 to .8 or even .5 watts per candle, with the same life.

"The two expedients work in different ways and produce different results. The 'getter' does not reduce the evaporation; it merely lightens the color of the deposit. It allows the filament to disintegrate, but minimizes one—and only one—of the harmful effects of disintegration."

In addition to the forgoing is the persuasive fact that nearly 20 years (1894–1913) elapsed between Waring and Langmuir, without any practical contribution in the way of a gas-filled lamp in an art which has attracted to it men of the highest attainments and which offers the most alluring financial rewards. The Blau patent, No. 674,754 of 1901, Thomson British patent, No. 18,968 of 1899, Anker British patent, No. 19,847 of 1908, Siemens & Halske British patent, No. 12,156 of 1902, Sander British patent, No. 14,411 of 1901, and Abel, No. 12,156 of 1902, at best, merely contain isolated elusive suggestions, valuable, if at all, only for a starting point of infinite experiment.

The argument of defendant is respect of the coiled filament has not been overlooked; but, if it be assumed that this knowledge was old, the problem still remained as to how to utilize it successfully in combination with other elements. Considering, then, these and the other references to patents and publications, which need not be discussed, the prior art had pointed out no hope, and so it happened that the tungsten lamp with the Coolidge advance was the last word of practical consequence until Langmuir's ability and toil evolved the invention in controversy. Indeed, unless Langmuir had worked out the coordination, there would have been no invention. As is briefly stated in the testimony:

"Q. 262. Then the mere substitution of nitrogen in the most favorable lamp of the prior art, as it would have been substituted by a skilled lamp maker, would not have produced favorable results? A. Would have resulted in failure. I think that those lamps on the shelves made in that way, if they were run in vacuum and given to a person five years ago, five or ten years ago, to be filled with nitrogen and run, that he would not have suspected that any advantage was to be gained by the use of nitrogen.

"Q. 263. But you had sufficient confidence in the theories which you had worked out and the experiments which you had conducted to resort to extraordinary and unusual purification, and then for the first time you produced favorable results? A. Yes."

From the foregoing it is plain that there can be no doubt that Langmuir contributed a highly meritorious invention to this art.

Looking, now, to the claims, the first attack is against their indefiniteness; but the case in this regard is well within the principles laid down in Eibel Process Co. v. Remington-Martin Co., 234 Fed. 624, 632, 148

C. C. A. 390. In the second place, there is nothing in the file wrapper which need give pause or embarrassment, for the most that can be said is that the claims were narrowed—a result which does not in any way help defendant.

So far as concerns these litigants, it is necessary to a decision of the case only to pass upon such claims as are clearly not open to argument. To go beyond that may be of no concern to defendant, but may inadvertently arrest the art. Plaintiff has fully appreciated the point of view indicated by the court in this connection on the trial in the observation:

"The question of invention is clear. The only other question raised is a technical one, whether those of the claims which do not specify tungsten are too broad to be sustained. We remark, first, in regard to this question, that it is hardly necessary to be decided in this case. If it were necessary, to save the patent, to read the limitation to tungsten into every claim in the case, it would not help this defendant, which uses tungsten. When, if ever, some other defendant comes along using Langmuir's co-ordination with some other filament, this question may, it would seem, be profitably discussed for the first time."

Even though not now probable, it is not impossible that some new filament, different from tungsten or other now known filaments, may be found. While it would seem that the claims would cover such a situation, it is undesirable to foreclose argument, especially as the claims are expressed in very comprehensive terms, which, though intended to mean much the same, might be capable of expansion.

It is enough, therefore, to hold claims 4, 5, 12, and 13 valid and infringed, without now passing on the remaining claims. Eibel Process Co. v. Remington-Martin Co., 234 Fed. at page 633, 148 C. C. A. 390.