## WESTINGHOUSE LAMP CO. v. C. E. MFG. CO., Inc.

District Court, D. Rhode Island. April 20, 1929.

No. 261.

Cooper, Kerr & Dunham and Victor S. Beam, all of New York City, and Horatio E. Bellows, of Providence, R. I., for plaintiff.

Charles J. Holland, of New York City, and O'Shaunessey & Cannon, of Providence, R. I., for defendant.

LETTS, District Judge. The Westinghouse Lamp Company brings this suit in equity against the C. E. Manufacturing Company, Inc., for infringement of letters patent No. 1,180,264 issued to Anton Lederer of Vienna, Austria, April 18, 1916, upon an application filed December 20, 1906. The bill contains the usual prayers for relief by injunction and for damages.

The plaintiff company at Bloomfield, N. J., is a manufacturer of electric lamps and radio tubes. It claims to be the owner of said letters patent, and alleges that the defendant company, which is also engaged in the manufacture of radio tubes at Providence, R. I., has infringed and is infringing upon said patent in making its type A tube. No other product of the defendant company is involved in this suit.

It is agreed that the general design and performance of the 201–A tube of the plaintiff and the type A tube of the defendant are substantially the same. Each tube em-

bodies a "hairpin" filament, taking the form of an inverted V surrounded by an elliptical plate with a grid interposed between the filament and the plate. Both tubes operate on a five to six volt one-quarter ampere current and give an emission of approximately 50 milliamperes. In fact, this type of tube appears to be made by many manufacturers. In the trade the design 201-A has become substantially a generic or descriptive designation of a tube of a given type.

Neither the plaintiff nor the defendant was the first in the field in its manufacture. The plaintiff began the manufacture of radio tubes in the year 1921, and the defendant began its manufacture some time in 1925. The plaintiff complains, however, that the patent here involved covers the thoriated tungsten filament used by it and that the defendant is also using a thoriated tungsten filament of substantially the same. structure and composition.

A word should here be interposed in explanation of the structure of these filaments and the reason therefor. In the construction of a radio tube of the type involved in this controversy the principal object to be attained is that of electronic emission, together, of course, with necessary durability. In the development of the radio tube industry it was found that most pure metals and carbon when heated at varying temperatures emitted electrons.

The original De Forest tube was constructed with a substantially pure carbon filament. It was found, however, that the efficiency of a tube was infinitely increased by employing a filament composed of tungsten with an admixture of a very small percentage of thorium. Thorium is a rare earth metal which is found to be used commercially, both in its metallic form (Th) and as an oxid (ThO₂) in which latter state it appears as a gray powder.

The presence of ThO₂ in the body of the filament does not increase the electronic efficiency of the filament, but the emission is greatly increased by the presence of a very slight percentage of thorium; the electronic emission being thereby increased about twenty times.

The patent in question is entitled "Incandescent Body for Electric Lamps." In the introductory paragraph of his specification the inventor states that:

"My invention relates to certain improvements in filaments *for incandescent electric lamps,* in particular such filaments as are essentially composed of metals that tend to alter internally under the influence of electric currents and to the process of manufacturing the same.

"It consists generally in the production of more durable and efficient incandescent filaments, containing an intimate mixture of such a metal with another metal or metallic compound which causes the filaments *to resist internal alterations during their use.*

"In the manufacture of filaments for incandescent lamps, and especially of filaments consisting of pure tungsten metal, it has been observed that, after burning .for some time, an alteration in the structure of such filaments takes place. This alteration, which manifests itself in a displacement of sections of a filament with respect to its longitudinal axis, is usually designated by the terms 'offsetting' or 'faulting', and is probably due to the crystallization of the metal. The appearance of this crystalline structure has the ˙deleterious effect that it renders the filaments considerably more brittle than they were before and it thus increases very greatly the liability of the filaments breaking when the lamp is in service or is subjected to shocks. *I have discovered that* by the addition of small percentages of suitable substances to the tungsten this crystallization and consequent deterioration of the filament can be largely obviated or entirely prevented. In one of the ordinary processes of manufacturing tungsten filaments it is usual to bring the tungsten metal, or an appropriate tungsten compound, into the shape of a plastic paste by means of an addition of a suitable binding material. I have found that when a *small amount of oxygen or oxygen containing compounds of rare earth metals* and like materials, such as thorium, zirconium, erbium, cerium, lanthanum, etc., is added to a paste of such a character, or to the materials used in making metallic filaments according to other processes, the resulting filament is structurally different from a filament consisting only of tungsten and .that the change-over of the filament into the crystalline structure is considerably delayed or altogether prevented. The presence of a binding material, is, of course, immaterial, nor does it matter at what time during the process of manufacturing these additions are made to the tungsten metal or tungsten compound, as long as they produce the desired result in the finished filament."

The inventor, after indicating that he has in mind a squirted filament, that is, a filament made from a paste forced through a die, which was in fact the only method of filament making known at the time, further states:

"It will, of course, be understood that my invention is not limited in its application to use in connection with any particular process of producing the filaments, but that, if desired, it may be employed in connection with any other process than that specifically set forth. It is also to be understood that my invention is not alone applicable to tungsten filaments but that it is also applicable to all filaments suitable for incandescent lamps and subject to offsetting or faulting in use."

In the concluding paragraph of the specification the inventor says:

"*I am aware that it has been proposed to make lamp filaments consisting of a mixture of a metal and an oxid,* but, in such cases, the oxid forms a large part of the finished filament, whereas, in my process, the oxid or other metallic compound is added only in sufficient quantity to accomplish the desired result. This result is essentially *the prevention of harmful internal alteration or 'offsetting', and the fact that the addition of other substances than the filament metal will produce this result has never, so far as I am aware, been suggested prior to my present invention.*"

The patent embraces a total of some 16 claims. Seven only of these are relied upon by the plaintiff. These seven claims are as follows:

"I claim as my invention:

"1. A filament composed mainly of a metal that tends to offset, when utilized as a conductor of electricity, and containing an offset resisting material.

"2. An essentially metallic filament for incandescent electric lamps which consists mainly of a metal that tends to offset, but which resists offsetting.

"3. A filament for incandescent electric lamps which consists mainly of tungsten and which resists offsetting.

"4. A filament for incandescent electric lamps consisting mainly of a material that tends to develop structural alterations when utilized as a conductor of electricity and containing an additional material for resisting such development.

"5. A filament for incandescent lamps composed mainly of a material that tends to crystallize when utilized as a conductor of electricity and containing an additional material for delaying such crystallization.

"6. A filament composed of an intimate mixture of a refractory metal of the tungsten type and such a quantity of an offset resisting material as will resist deleterious alteration within the said filament when the said filament is utilized as a conductor of electricity."

"9. A filament for incandescent electric lamps composed of an intimate mixture of a refractory metal of the tungsten group and an additional material which comprises at least one of a group of substances including thorium, zirconium, erbium, cerium, and lanthanum, and the oxygen compounds of the said metals, the said additional material being present in substantially sufficient quantity to prevent deleterious alteration within the said filament during use."

The plaintiff contends that its filament is manufactured by the introduction or admixture into the tungsten body of a small percentage of thoria, and that in the process of manufacturing the tube, its seasoning and flashing, so called, a portion of this thoria is reduced to thorium distilled to the surface of the filament, giving to it the desired electronic efficiency. The residue of the oxid, not so reduced, remains, it is claimed, in the body of the filament to retard its crystallization, functioning as described in the patent involved in this suit. The plaintiff further contends that whatever may be the process by which the filaments employed by the defendant are manufactured, substantially the same result in the end is reached, and that the residual nonmetallic inclusions of thoria retard crystallization thereby infringing upon the rights of the plaintiff under its patent.

This contention is based upon the assumption that the radio tube filament presents the same mechanical problem as the incandescent lamp filament, namely, the problem of forestalling rupture or offsetting of its crystal structure.

The defendant contends that its tubes are manufactured by a process which reduces at the outset all of the oxid to metallic form, and that it is not important that there should be a residue of $ThO_2$ to serve as a retarding agency of crystallization which, it is claimed, presents no mechanical problem in connection with a filament for a 201–A type tube. It is contended that the low temperatures at which these tubes are operated, employing a direct current only, creates no mechanical problem incident to the crystallization. It is contended that the life of the tube for practical purposes is terminated by the exhaustion of its electronic emission, rather than by its breakage or burning out because of offsetting.

The record which has been made is not satisfactory in so far as a determination becomes important of the structure and com-

position of the alleged infringing filaments. To a large extent the testimony of the witnesses of the respective parties relates to an examination of materials and filaments, the identity of which is not established. The result of the chemical, X-ray, and photographic examinations, while seemingly in conflict, are not in general necessarily so. Most of the plaintiff's expert testimony relates to the examination of two lots of Ceco type A tubes purchased from the defendant April 14, 1926, and June 17, 1926, respectively. It appears that about this time, and before the institution of this suit, the defendant company turned to another source, namely, to the Callite Products Company, for the purchase of its filament wire and that from and after that date its wire was purchased exclusively from that company. Mr. Kauer, manager of the defendant company, testified that in his opinion no one could with certainty tell who made the filament wire which was utilized in the tubes purchased by the plaintiff and examined by its experts. It was this Callite Products Company wire, lot No. 267 (which will hereafter be referred to as the Laise wire), its structure and composition, to which the expert testimony on behalf of the defendant relates.

There are, apart from the structure of the filaments, other questions raised by the pleadings and record which necessitate an inquiry into plaintiff's ownership of, and the meaning and scope of, the patent, and, in the light of that interpretation, to consider, first, the question of its validity, and, secondly, the question of infringement both in reference to the filaments used in the tubes purchased by the plaintiff from the defendant in April and June of 1926 and in relation to the Laise filaments exclusively used as of the date of the bringing of this suit.

The parties introduced in evidence a stipulation, together with certain exhibits annexed thereto, relating in part to the ownership or title to this patent. From this stipulation it appears that shortly after the issuance of the patent, to wit, on May 9, 1916, Anton Lederer acknowledged before the United States Consul General in Vienna an assignment of the patent to the plaintiff, the Westinghouse Lamp Company. This assignment was received in the United States Patent Office August 28, 1919, and there recorded. It was further stipulated that a copy of this assignment, signed only in typewriting, was legalized before a notary at Aarau, Switzerland, April 12, 1918, and received and recorded in the United States Patent Office August 15, 1918. On March 3, 1922, the Chemical Foundation, Inc., by its president, acknowledged an assignment of the patent to the plaintiff, which assignment was received and recorded in the United States Patent Office on April 22, 1922.

The stipulation and record are silent as to the date of delivery of the assignment of May 9, 1916, and likewise silent in respect to the date and manner in which the Alien Property Custodian purported to effect the seizure of this patent as referred to in the assignment by the Chemical Foundation, Inc., nor is there any evidence in the record as to whether Anton Lederer, during the period that a state of war existed between the United States and Austria, was an enemy alien within the meaning of the statute under which the Alien Property Custodian acted. The assignment by Lederer acknowledges receipt of consideration and contains a covenant that he will at any time, upon request: "Execute and deliver any and all papers that may be necessary or desirable to perfect the title to said invention or any letters patent that may be granted therefor in said Westinghouse Lamp Company."

It was orally contended by counsel for the defendant at the time of trial that good title to this patent had not been shown resident in the plaintiff; that there had been a seizure of the patent by the Alien Property Custodian and conveyance by him to the Chemical Foundation, Inc.; and that under the trust provision of the charter of the Chemical Foundation, Inc., there was no power to convey any interest in this patent to the plaintiff. No evidence was, however, introduced in respect to any such limitation upon the corporate powers of the Foundation.

The plaintiff contended that title was vested in the Westinghouse Lamp Company by virtue of the assignment of May 9, and that the subsequent action by the Chemical Foundation, Inc., was merely a recognition on its part of the rights of the plaintiff in and to the patent.

This court is well aware of the technical difficulties that defendant could have interposed to plaintiff's title considering the complexities of the provisions of the statute under which the Alien Property Custodian acted, but, in the absence of any evidence as to when the Custodian acted or as to how he acted, and in the absence of any evidence as to the provisions of the charter of the Chemical Foundation, Inc., and in view of the provisions of the assignment of May 9, 1916, and the acknowledgment therein of the receipt of the consideration for the assignment

of the patent, this court is of the opinion that a prima facie case of good title in the plaintiff has been established to the rights, if any, acquired by Lederer by virtue of the letters patent here involved.

We come now to a review or interpretation of the scope and meaning of Lederer's claim of invention. The original application was filed with the Commissioner of Patents on December 20, 1906. In this application, which was for an "Improvement in Incandescent Bodies for Electric Lamps," the applicant presents eight claims of invention.

At the time this application was filed there were in existence several patents and some scientific literature, which are here considered only in relation to the prior state of the art.

The Welsbach patent, which antedated Lederer's application by about eight years, describes the use of the oxid of thorium in conjunction with osmium in the manufacture of an incandescent filament for an electric lamp.

The Just and Hanaman patent, issued by the French Republic in May, 1906, describes a method of manufacturing filaments for incandescent lamps having for its object the attainment of tungsten filaments or wires in which the addition of other metals furthers the formation of elongated crystals and procures adequate resistance. Among the more fusible metals suggested to accomplish this effect upon the crystallization of the wire are enumerated thorium and zirconium, which are also referred to by Lederer in the process which he describes.

While the Just and Hanaman patent refers to the inclusion with tungsten of the enumerated more fusible metals, including thorium, in their metallic state, it does include in a latter paragraph the following significant statement:

"Instead of adding to the tungsten metals themselves in an easily pulverizable condition, it is possible also to use *their oxids* or their other compounds, reducible by carbon. For in this latter case also, the metal is returned to a pure state in the wire after carbonization."

This situation is apparently substantially what Lederer had in mind when in his amended application under date of May 27, 1911, under the title of "Remarks," appended to that amendment, he states:

"Applicant does not believe nor does he claim that the oxid which he adds to the paste from which he squirts his filaments remains as such in the finished filament. On the contrary, he claims that instead of re-maining conductors of the second class they are converted into conductors of the first, either by a reduction to the sub-oxid, which is more likely, or by reduction to the metal."

The Belgium patent of 1904 to Siemens & Halske Corporation was for an incandescent body made of molybdenum, of thorium, of tungsten, of zirconium or alloys of these metals.

The Belgium patent of 1906 to the Société Anonyme Reunie D'Electricite related to a partially fused mixture of metallic tungsten with small additions of other metals, among which enumerated classes was included thorium. The patent related to an incandescent body for electric lamps, and the admixture of the specified metals was claimed to induce fusing in order to make the filament sufficiently solid and elastic.

The Kellner British patent of 1899, to which repeated reference is made by the Patent Examiner in the file wrapper, was for "Improvements in Incandescent Bodies for Incandescent Electric Lamps and in the Process of Manufacturing the same." Kellner in his specification states:

"Incandescent bodies according to the present invention enable the greatest portion of the electric energy supplied to be converted into light, because they can be raised by the electric current to the brightest white heat *without becoming deteriorated*. These incandescent bodies consist of infusible metals, which are not very good conductors of electricity and which have a high capacity for emitting light, such as thorium, or of almost infusible metals, such as titanium, (in the form of pure titanium or nitrid of titanium,) chromium, or wolfram, or alloys of such metals, incandescent bodies made of these infusible or almost infusible metals or alloys being oxidized at their surfaces, or of mixtures of (a) almost infusible metals or alloys of the same, or (b) graphite of the kind which offers the very greatest resistance to conversion into graphite acid by potassium chlorate and nitric acid (graphite of high density up to 2.25 specific gravity) *with metallic oxids that are infusible or are fusible with difficulty and capable of emitting light, such as thorium oxid*, with or without an addition of cerium oxid."

A review of the patents and scientific literature offered in evidence by the defendant established beyond question that Lederer was not the first to teach the use of either thorium or thoria in conjunction with other metals, including tungsten, in the manufacture of filaments for incandescent bodies. The review of the file wrapper, and particularly the

remarks appended by Lederer to his repeated amendments to his specification and claims, indicates this clearly. Lederer was not the first to suggest that the addition of one of the rare earth metals has an effect upon crystallization. The Just and Hanaman patent, already referred to, specifies as one of its objects the attainment of a tungsten filament "in which the addition of other metals further the formation of elongated crystals."

A study of the prior art indicates that while Lederer, by his patent, was not the first to teach the use of thoria or thorium in conjunction with tungsten, nor the first to disclose the fact that there was a resultant effect on the crystallization of the filament, he was probably the first to emphasize the fact that when the crystal structure of the filament takes a certain form it permits offsetting similar to the effect that would be accomplished by taking a broken wire, or other conductor, and unevenly butting the broken ends together so that at this point the actual area of the conductor would be made small, the resistance to current and heat increased, causing the conductor at that point to burn out.

Lederer added no new element; created no new combination of elements. He observed specifically a result of a combination already taught in the art, which result was only generally suggested in the Just and Hanaman patent where reference is made to the "formation of elongated crystals."

In the remarks appended to the amended application of November 21, 1914, appears the following:

"In asking that this application be reconsidered, applicant requests the Examiner to bear carefully in mind the fact that applicant was the first *investigator* in the metallic lamp filament art to recognize the troublesome phenomenon known as 'offsetting' and to propose a remedy for it."

The remedy proposed was, however, already being employed and its remedial effect partially understood. Lederer investigated further, observed more specifically, and procured his patent upon his more specific observation. The most liberal construction must limit Lederer's claim of invention to the prevention of offsetting and within the limits of the teachings of his patent. These teachings are somewhat confused by the contention of counsel that the thoria used in the making of a filament, under Lederer's patent, remains in the wire largely as a nonmetallic inclusion, namely, as $ThO_2$; whereas, the file wrapper discloses that in the course of procuring his patent the inventor's contention was that $ThO_2$ in the finished product did not remain as such, but is reduced to its metallic form or at least a suboxid.

Under the date of May 27, 1911, Lederer wrote the Patent Examiner as follows:

"Applicant does not believe nor does he claim that the oxid which he adds to the paste from which he squirts his filaments remains as such in the finished filament."

The value to the art of the teachings of Lederer's patent is further circumscribed by the fact that as of the time the application was presented all filaments were "squirted" or "extruded" filaments.

Shortly thereafter other patents, including the Coolidge patent, were granted teaching methods of making drawn-wire filaments. These soon superseded, for all commercial use, the "squirted" or "extruded" filaments. No commercial use of Lederer's patent, or information given therein in connection with squirted filaments, appears ever to have been made. If any, it was exceedingly limited.

It is conceded that in the manufacture of drawn-wire filaments the percentage of thorium, whether in oxid or metallic form, must of necessity be very small. In commercial use filaments for illuminating purposes employ less than one-half of 1 per cent., and filaments for radio tube purposes not over $1\frac{1}{2}$ per cent. No one skilled in the art could learn from the specification of Lederer's patent what proportion of tungsten and thorium, in either metallic or nonmetallic form, should or could be used in a drawn wire filament. That problem remained to be solved in the art.

In fact, the discovery of the process by which tungsten could be rendered sufficiently ductile to be drawn is the subject of another patent issued in 1913, the invention of William D. Coolidge. General Electric Co. v. De Forest Radio Co. (C. C. A.) 28 F.(2d) 641.

So far as the patent disclosed, Lederer neither taught nor knew anything about the use or effect of thoria in a drawn wire. He was acquainted only with the action of this ingredient in connection with tungsten when admixed in paste form and extruded as a porous fragile filament. To accredit to him the teaching of the effect of using a small and scientifically exact percentage of thoria as now employed in making a wire drawn from tungsten rendered ductile by the Coolidge process would attribute to Lederer knowledge which he did not have and most certainly did not disclose in his patent. In fact, there appears to be some basis for the contention that the use of thoria in a drawn tungsten fila-

ment to control offsetting is covered by the Coolidge patent. General Electric Co. v. Independent Lamp & Wire Co. (D. C.) 267 F. 824.

The Lederer patent is not a product patent. The possibility of this claim was precluded by the Just and Hanaman patent. General Electric Co. v. Alexander (D. C.) 277 F. 290; Id. (C. C. A.) 280 F. 852; General Electric Co. v. P. R. Mallory & Co. (D. C.) 294 F. 562; Id. (C. C. A.) 298 F. 579.

It is exceedingly doubtful if what Lederer did was invention. It was probably scientific observation without the employment or suggestion of any new combination of materials or the use or adaptibility of known elements to a new or different purpose, amounting to a discovery of new characteristics. But, assuming that plaintiff's patent embodies limited invention and assuming that its specification and claims could be related to the drawn wire filament and the action of thoria thereon of which Lederer knew nothing, still, to establish any basis for a claim of infringement, the plaintiff must show the presence of two factors: First, that a tungsten filament used in a radio tube presents a mechanical problem due to offsetting; and, second, that the wire used by the defendant contains a residue of the oxid of thorium sufficient to obviate to some tangible degree that problem.

From a review of all the testimony and exhibits, this court is satisfied that a radio tube of the 201–A type, as operated, presents no mechanical problem of offsetting of tangible importance.

Lederer, in a paper which is included in the file wrapper as an exhibit to paper No. 18, which appears to have been published in the Electric Journal in November, 1913, at page 1175 says:

"In the case of tungsten incandescent filaments, which are exposed to very high temperatures, crystallization takes place in a comparatively short time. *When used with direct current the thickenings and wrinkles appear only in a longitudinal direction.* When burned on alternating current circuits, the adjacent surfaces, owing to the dynamic influence of the surrounding magnetic field, are subjected to a sliding movement which, if it takes place in a direction perpendicular to the axis of the filament, causes considerable displacements of some parts of the filament which eventually lead to their being separated, as shown in Fig. 10."

The life of the tube under normal conditions is terminated by the exhaustion of its electronic emission, not by the rupture of its crystal structure.

The evidence, as was pointed out earlier in this opinion bearing upon the question of the metallurgical composition of the filament wires used by the defendant, is not satisfactory. From the testimony, this court is compelled to find, in respect to the two lots of tubes purchased from the defendant in the spring of 1926, that the filaments contained thoria. It will be recalled that there was no testimony presented by the defendant as to the analysis of the filaments of these or other tubes made from the same wire. The weight of the evidence in respect to the Laise wire used by the defendant, from a time prior to the institution of this suit, would indicate that its thorium content was in the metallic and not the oxid form. In respect to this wire, there was very little testimony presented by the plaintiff, and it of a character which was not convincing in the face of the positive testimony of Mr. Laise, who manufactured the wire, corroborated by the additional expert testimony presented by the defendant.

Lederer, knowing nothing of drawn wire or radio filaments, taught in his patent that an uncertain amount, but not in excess of 7 to 10 per cent. of thoria, used with powdered tungsten, with other constituents as a binder in forming a paste from which to make a squirted filament for an incandescent lamp to be operated with alternating current at the high temperatures necessary for illumination, would so influence the crystal structure of the filament as to retard or prevent offsetting of the crystal segments.

The defendant uses a drawn-wire filament which contains a small, but scientifically exact, quantity of thorium (excepting herefrom tubes purchased in June, 1926, made from another filament wire) in the manufacture of radio tubes, which are not lamps but mechanical parts of a radio receiving set. These tubes are operated on a direct current at only sufficient temperature to produce electronic emission. Electrons, not ions or light, are the results desired. This electronic emission is accelerated by a metallic thorium content and unaffected by thoria. Any incandescence present in the operation of the tube is an incident to the necessary heating of the filament and is not utilized in its functioning. If there be present to any degree the so-called phenomenon of offsetting, it is not sufficiently marked to constitute a mechanical problem or, generally speaking, to affect the life of the tube.

The plaintiff asserts, nevertheless, that the use by the defendant outlined constitutes

an infringement of its patent. To uphold such a contention would not further, but impede, the progress of the art. It would necessitate a disregard of the intendment of the patent law.

The bill of complaint will be dismissed, with costs, and an appropriate draft decree may be presented for entry.